**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RONNIE SCOTT, | |
| Plaintiff, | Case No. 1:19:-cv-08177 |
| v. | Honorable Mary M. Rowland |
| CHEVROLET OF HOMEWOOD, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

**RESPECTFULLY SUBMITTED BY:**

**CHEVROLET OF HOMEWOOD, INC.**

By Its Attorney:
Bethany N. Schols
Hardt, Stern & Kayne, P.C.
2610 Lake Cook Road, Suite 200
Riverwoods, IL 60015
Telephone: (847) 597-2150
bschols@hsklaw.com

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION…………………………………………………………… | | 1 |
| II. | SUMMARY JUDGMENT STANDARD…………………………………… | | 1 |
| III. | ARGUMENT………………………………………………………………… | | 2 |
| | A. | The Undisputed Material Facts Show that Mr. Scott Was Not Discriminated Against Because of His Race……………………………… | 2 |
| | | 1. Mr. Scott Was Treated the Same as Similarly Situated White Employees When the Dealership Called the Police to Report Unlawful Conduct............................................................................... | 3 |
| | | 2. Mr. Scott Was Treated the Same as All Salespersons in the Way in Which the Dealership Paid Commissions………………………… | 4 |
| | | 3. Mr. Scott Was Treated the Same as All Salespersons Regarding Work Hours.……………………………………………………….. | 5 |
| | | 4. Mr. Scott Was Treated the Same as Similarly Situated White Salespersons in the Way that the Dealership Provided Access to Leads from AutoAlert…………………………………………….... | 5 |
| | | 5. Mr. Scott Was Treated the Same as All Salespersons Regarding Bonus Payments for Making Social Media Videos……………….. | 6 |
| | | 6. Mr. Scott Was Treated the Same as Similarly Situated White Employees When He Was Required to Execute an Acceptance of Named Driver Exclusion……………………………………………... | 7 |
| | | 7. Mr. Scott Was Treated the Same as All Salespersons in the Qualification for and the Payment of Bonuses…………..……... | 7 |
| | | 8. Taken as a Whole, the Evidence Does Not Permit a Factfinder to Conclude that Mr. Scott's Race Was the Cause of His Treatment at the Dealership……………………………………………………….. | 9 |
| | B. | The Undisputed Material Facts Show that Mr. Scott Was Not Discriminated Against Because of His Religion …...…………………… | 10 |
| | C. | The Undisputed Material Facts Show that Mr. Scott Cannot Prevail on His Retaliation Claim……...………...…………………………………… | 12 |
| IV. | CONCLUSION………………………..…………………………………….. | | 14 |

**I.     INTRODUCTION**

Plaintiff, Ronnie Scott, a former salesperson at Chevrolet of Homewood, Inc. (the "Dealership"), has amassed a laundry list of ways in which he believes he was treated differently because of his race or his religion, and in which he was retaliated against. Between the filing of his EEOC Charge and his deposition two years later, the ways in which Mr. Scott believes he was wronged multiplied, but the evidence to support those beliefs did not materialize.

When taken as a whole, the evidence would not permit a trier of fact to conclude that Mr. Scott's race or religion caused him to be treated differently by the Dealership. And, there is simply no evidence that Mr. Scott was retaliated against. Accordingly, summary judgment should be entered in favor of the Dealership on Mr. Scott's three-count complaint.

**II.    SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1985). It serves justice, when appropriate, by stopping a case before trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding to grant summary judgment, this Court reviews "all facts and draw[s] all reasonable inferences in favor of the party against whom the motion" was filed. *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016). The issue for the court is not whether the evidence unmistakably favors one side or the other, but whether a jury could return a verdict for plaintiff on the evidence presented. *Anderson,* 477 U.S. at 248.

### III.    ARGUMENT

####    A.    The Undisputed Material Facts Show that Mr. Scott Was Not Discriminated Against Because of His Race.

It is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To succeed on a Title VII discrimination claim, the employee must prove that:

1.  he is a member of a class protected by the statute,
2.  he has been the subject of some form of adverse employment action, and
3.  the employer took this adverse action on account of the plaintiff's membership in the protected class.

*Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (internal citation omitted). In evaluating such a claim, this Court looks at whether the evidence, as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race caused the adverse employment action. *Id.*

To do so, courts look frequently to the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," but *McDonnell Douglas* is "not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). "McDonnell Douglas identifies one pattern that the evidence might fit that would enable a reasonable juror to find discrimination," mainly, "evidence showing that the plaintiff belonged to a protected class, met [his] employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class and who were treated better," if "the defendant fails to articulate a reasonable alternative

2

explanation or the plaintiff shows that the defendant's . . . explanation is a pretext." *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655 (N.D. Ill. 2016).

Mr. Scott testified regarding a panoply of employment actions and ways in which he believed others were treated more favorably, and concluded that these "actions" were taken due to racial discrimination. But, Mr. Scott cannot make out a *prima facie* case. Mr. Scott cannot show that he was denied any "perks" to which he was entitled, or that he was treated disparately with respect to adverse actions. Mr. Scott cannot show that he qualified for any "perks" that he did not get or that he was treated disparately with respect to adverse actions. The record is devoid of any similarly situated coworker that received preferential treatment. Accordingly, summary judgment in favor of the Dealership is appropriate.

> 1. **Mr. Scott Was Treated the Same as Similarly Situated White Employees When the Dealership Called the Police to Report Unlawful Conduct.**

Mr. Scott testified that he was discriminated against based on race when the Dealership called the police on January 25, 2019. [Stmt. ¶12.] He further believes that the Dealership would not have called the police on January 25th had he been white. [Stmt. ¶21.] The undisputed facts belie his belief.

It is undisputed that the Dealership received a call from GM Financial saying that a proof of residency ("POR") required in a particular transaction was fraudulent, which amounts to bank fraud. [Stmt. ¶28.] The customers, both Black, said their salesperson, Mr. Scott, was responsible for the fraudulent POR. [Stmt. ¶30.] The Dealership called the Homewood Police Department. [Stmt. ¶17.]

In so doing, the Dealership did not treat Mr. Scott any differently than it treated its white employees. This was not the first time the Dealership had called the police. On March 22, 2018, the Dealership called the police when it believed K.M., a white employee, had stolen money

3

from the Dealership. [Stmt. ¶13.] On May 1, 2018, the Dealership called the police when it believed that J.K., a Greek employee, had participated in fraudulent activity. [Stmt. ¶15.]

There is no evidence to suggest that racial animus caused the Dealership to call the police. Rather, the Dealership treated the situation involving Mr. Scott just as it treated other situations in which illegal activity was believed to have occurred - the Dealership called the police.

### 2. Mr. Scott Was Treated the Same as All Salespersons in the Way in Which the Dealership Paid Commissions.

The Pay Plan is undisputed. [Stmt. ¶22.] Salespersons were only paid commissions on completed deals – those in which all of the paper work was done, all of the money was received and the lender had provided the funding. [Stmt. ¶23.] If the Dealership had to repurchase a lease or contract, the salesperson did not get paid a commission on that transaction. [Stmt. ¶24.] Mr. Scott's pay was subject to this Pay Plan. [Stmt. ¶22.]

Mr. Scott complains that he did not receive his commission on the January 5, 2019, lease of a 2019 Chevrolet Blazer (the "Vehicle"). [Stmt. ¶12b.] But, Mr. Scott should not have been compensated for this transaction under the Pay Plan. The Motor Vehicle Lease Agreement ("Lease") was assigned to ACAR Leasing Ltd., a subsidiary of GM Financial. [Stmt. ¶27.] GM Financial notified the Dealership that the proof of residency submitted on behalf of the Customers was *fraudulent.* [Stmt. ¶28.] It demanded that the Dealership repurchase the Lease. [Stmt. ¶28.] The Dealership repurchased the Lease from GM Financial for a total of $54,355.22, returned the down payment of $6,800 to the lessees, and recovered the Vehicle. [Stmt. ¶31.] Mr. Scott was not entitled to his commission on the Lease. [Stmt. ¶24.]

Mr. Scott also complains that his commission was delayed in a sale to S.T. [Stmt. ¶12b.] But, there is zero evidence that Mr. Scott's payment was delayed. Mr. Scott testified that this was

4

a so-called "secondary deal," which takes longer to complete. [Stmt. ¶33.] Upon funding, Mr. Scott received his commission. [Stmt. ¶33.] Mr. Scott has presented no evidence that his commissions were paid differently than similarly situated non-Black salespersons.

### 3. Mr. Scott Was Treated the Same as All Salespersons Regarding Work Hours.

The Dealership was open six days a week, Monday through Saturday. [Stmt. ¶34.] Salespersons, including those who worked in the Business Development Center, worked five days a week, with one day off. [Stmt. ¶34.] On the last week of the month, it was standard for salespeople to work the full week, including their usual day off to increase their unit sales for bonuses. [Stmt. ¶34.]

Mr. Scott testified that white salespersons didn't work this day off, but if he didn't work that day, he was reprimanded or disciplined. [Stmt. ¶12c.] Mr. Scott presented no evidence to support his testimony. But, there is much to belie it.

The undisputed material facts show that not everyone worked their day off during that last week of the month. L.L. (Black), M.B. (Black) and M.M. (Moroccan) did not work their day off during that last week of the month. [Stmt. ¶35.] They were neither reprimanded nor disciplined. [Stmt. ¶35.] On the other hand, T.L. (white) and M.A. (white) almost always worked their day off on the last week of the month. [Stmt. ¶36.] Mr. Scott did not provide evidence of any similarly situated salesperson of any race to which he was treated differently.

### 4. Mr. Scott Was Treated the Same as Similarly Situated White Salespersons in the Way that the Dealership Provided Access to Leads from AutoAlert.

AutoAlert is a paid data-mining tool with information about service customers and previous customers who purchased from the Dealership. [Stmt. ¶37.] It can be a source of additional leads for a salesperson. [Stmt. 37.] Mr. Scott believes that he was not provided access

5

because of his race. [Stmt. ¶12d.] But, not all salespersons had access to leads from AutoAlert. [Stmt. ¶.] Only salespersons with a proven track record of making calls and returning calls got access to leads from AutoAlert. [Stmt. ¶38.] It did not matter how many cars you sold, only how many calls you made. [Stmt. 38.]

Mr. Scott points to a white salesperson, M.A., as a similarly situated employee who was treated differently. But, M.A. and Mr. Scott are not similarly situated. Mr. Scott did not make his phone calls. [Stmt. ¶39.] Accordingly, Mr. Scott was treated like A.H. (white), C.B. (white), and M.M. (Moroccan) who were all similarly situated to Mr. Scott – they did not make the calls either and, therefore, did not have access to leads from AutoAlert. [Stmt. ¶40.] *Abrego,* 907 F.3d at 1013 (a coworker is similarly situated if they have the same "shortcomings") (internal citations omitted).

M.A., on the other hand, made his calls. [Stmt. 39.] M.A. (white) was treated like M.B. (Black), A.L. (Black), and E.C. (Black), who all had access to leads from AutoAlert because they made their phone calls. [Stmt. ¶39.]

> 5. **Mr. Scott Was Treated the Same as All Salespersons Regarding Bonus Payments for Making Social Media Videos.**

The Dealership allows its salespersons to use Dealership resources to make videos that are posted to the Dealership's social media feed to give customers knowledge of the vehicles, to advertise the Dealership, and to showcase the salesperson in the video. [Stmt. ¶41.] Salespersons did not get paid extra for making these videos. [Stmt. ¶43.] Instead, by making the video, the salesperson receives free advertising. [Stmt. ¶¶41-42.] A customer who views the video and is interested in taking a test drive or asking questions about the vehicle in the video, sees the name of the salesperson, his phone number, and his email address. [Stmt. ¶41.] For example, in the video Mr. Scott made, Mr. Scott's name and contact information appeared prominently on the

6

screen. [Stmt. ¶42.] Mr. Scott presented no evidence that any other salesperson was ever paid to make a video with the Dealership's resources to post on its social media – because there isn't one.

### 6. Mr. Scott Was Treated the Same as Similarly Situated White Employees When He Was Required to Execute an Acceptance of Named Driver Exclusion.

The Dealership maintains a standard liability insurance policy that covers its employees who drive Dealership or customer vehicles. [Stmt. ¶44.] In deciding coverage for the Dealership, the insurance underwriter, not the Dealership, reviews the motor vehicle records for Dealership employees to be covered under the policy. [Stmt. ¶45.] Employees with "questionable or unacceptable MVRs," as determined by the underwriter, are excluded from the policy requiring an "Acceptance of Named Driver Exclusion" to be executed by both the excluded employee and the Dealership. [Stmt. ¶46.] Mr. Scott claims he was singled out to execute the required insurance document. Not so.

On October 2, 2018, the Dealership received notification that the insurance company would not issue the Dealership's policy without signed exclusions for J.C. (Black), F.F. (white), Mr. Scott, C.F. (Black) and T.F. (white). [Stmt. ¶47.] The Dealership required those still employed by the Dealership, J.C. (Black), F.F. (white), and Mr. Scott, to sign the exclusions. [Stmt. 48.] Mr. Scott was treated as similarly situated white employee F.F. [Stmt. 48.] He has provided zero evidence to suggest otherwise.

### 7. Mr. Scott Was Treated the Same as All Salespersons in the Qualification for and the Payment of Bonuses.

To qualify for any bonus, the salesperson must "meet or exceed" the target Customer Satisfaction Index ("CSI") measurement as determined by the General Motors' geographic zone in which the Dealership operates. [Stmt. ¶49.] Mr. Scott believes that he was treated differently

than similarly situated white salespersons in qualifying for bonuses. [Stmt. ¶12g.] But, to support his claim, once again, Mr. Scott cannot point to one salesperson with whom he was similarly situated who received bonuses when Mr. Scott did not. Instead, the undisputed material facts shows that the eligibility and qualification for unit bonuses and salesperson of the month bonuses were based on simple math.

First, monthly Unit Bonuses were paid to salespersons with the following number of completed deals, so long as they were qualified to earn a bonus:

[illegible bonus schedule image]

[Stmt. ¶22 at Ex. F.] In other words, even if a salesperson hit one of these unit targets, he still may not "qualify" to earn that bonus. [Stmt. ¶Id.] To qualify for any bonus, the salesperson must "meet or exceed" the target Customer Satisfaction Index ("CSI") measurement as determined by the General Motors' geographic zone in which the Dealership operates. [Stmt. ¶Id.] These numbers came from General Motors. [Stmt. ¶50.]

The undisputed material facts show that if a salesperson did not qualify for a bonus because of the CSI report, it didn't matter if that salesperson was white, Black or Other – s/he did not receive a bonus. [Stmt. ¶¶51, 52.] The records show that white salespersons did not receive a bonus when they did not meet or exceed the target CSI. [Stmt. ¶51.] Salespersons categorized as Other did not receive a bonus when they did not meet or exceed the target CSI. [Stmt. ¶52.] The records also show that Black and Other salespersons regularly qualified for Salesperson of the Month, the highest bonus level at the Dealership. [Stmt. ¶53.] Bonuses were paid based on the numbers, not race.

8

> 8. **Taken as a Whole, the Evidence Does Not Permit a Factfinder to Conclude that Mr. Scott's Race Was the Cause of His Treatment at the Dealership.**

Mr. Scott presented no evidence that he was treated differently in the above ways. But, the inquiry is not done. This Court must also consider the racially charged language Mr. Scott testified to hearing. Even considering that language, taken as a whole, no reasonable juror could infer that the Dealership didn't much like African American salesperson and treated Mr. Scott differently because of it.

Over the three and a half years that Mr. Scott worked there, there were few instances where Mr. Scott heard racially insensitive comments[1]. [Stmt. ¶¶55, 57, 58.] "While such statements are in no way acceptable in the workplace or otherwise, 'stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.'" *Outley v. City of Chicago*, 354 F. Supp. 3d 847, 866-67 (N.D. Ill. 2019), quoting *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) (quoting *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (overruled on other grounds)). Accordingly, these statements simply cannot establish a discriminatory motive. They were made by coworkers and cannot be connected to any decisions made by the Dealership. *Outley*, 354 F. Supp. 3d at 867

Mr. Scott testified that he complained to Mr. Cuban twice regarding hearing the N-word, but the Dealership disputes that testimony. [Stmt. ¶56.] Mr. Scott testified that Mr. Cuban did nothing regarding his complaint(s), and the Dealership disputes that testimony also. [Id.] But, even viewing the evidence in the light most favorable to Mr. Scott, his claims fail.

The Dealership's clear written policy on harassment is undisputed. [Stmt. ¶8.] If an employee was being harassed or discriminated against and received no relief by complaining to

---

[1] This Court should take note that Mr. Scott did not mention these comments in his EEOC Charge, or in his Complaint, or in his Mandatory Initial Disclosures, or in his answers to Interrogatories. [Stmt. ¶54.]

his or her supervisor, the employee was to go to the Comptroller, Gina Morin, or the President, Steve Phillipos. [Stmt. ¶8.] It is also undisputed that Mr. Phillipos maintained an open-door policy. [Stmt. ¶9.]

Further, the case law is clear; Mr. Scott must "at a minimum [tell] someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert v. Peri Formworks Sys., Inc.,* 723 F.3d 863, 866-67 (7th Cir. 2013), *quoting Parkins v. Civil Constructors of Ill.* 163 F.3d 1027, 1037 (7th Cir. 1998). Despite the clear written policy and the law, Mr. Scott never went to Ms. Morin. [Stmt. ¶61.] And, the one time Mr. Scott complained to Mr. Phillipos about a coworker using the N-word, that coworker was fired. [Stmt. ¶¶58-60.] If Mr. Scott was being harassed and the matter was not being resolved, he knew he could go to Mr. Phillips. He chose not to.

Given the undisputed testimony, and viewing the evidence as a whole, stray remarks would not permit a reasonable factfinder to conclude that Mr. Scott's race caused the alleged adverse job actions for which he complains. Summary judgment is proper on Mr. Scott's Title VII race discrimination claim.

  **B.**  **The Undisputed Material Facts Show that Mr. Scott Was Not Discriminated Against Because of His Religion.**

Scott alleges that he was discriminated against because of his religion. He testified that Mr. Schutz, a co-worker, made derogatory comments about his religion. [Stmt. ¶71.] Specifically, he testified about two statements that Mr. Schutz made against Mr. Scott's religion: "I didn't know they let faggots in Hebrew, be Hebrew" and Mr. Scott wasn't "a Hebrew." [Stmt. ¶71.] Taking Mr. Scott's testimony as true, Mr. Schutz's comments were offensive and should not be tolerated. But, Title VII is "not a general civility code and will not find liability based on the sporadic use of abusive language." *Ford v. Minteq Shapes & Services*, 587 F.3d 845, 846

10

(7th Cir. 2009).

Be that as it may, once again, Mr. Scott failed to follow the clear procedures set forth by the Dealership to address claims of discrimination. It is undisputed that the Dealership's Handbook states:

> If you believe that a supervisor or member of management has acted inconsistently with this policy, if you are not comfortable bringing a complaint regarding harassment to your immediate supervisor, or if you believe that your complaint concerning a coworker, a customer, a vendor has not been handled to your satisfaction, please immediately contact either Gina Morin, Comptroller or Steve Phillipos, President.

[Stmt. ¶8.] Despite this clear direction, Mr. Scott did not go to Ms. Morin to complain. [Stmt.¶73.] And, Mr. Scott did not go to Mr. Phillipos to complain. [Stmt. ¶74.] *Lambert,* 723 F.3d at 866-67 (7th Cir. 2013), *quoting Parkins,* 163 F.3d at 1037.

Next, Mr. Scott testified that, when he wore his religious amethyst jewelry to the Dealership, the Dealership put a notice on every employee's paycheck changing the dress code to prohibit the wearing of religious jewelry. [Stmt. ¶64.] But, no such notice has been produced. [Stmt. ¶69.] And, no one else remembers any such notice; not former employees, not Ms. Morin who is responsible for disseminating notices regarding changes in the dress code, and not Mr. Phillipos who sets the dress code. [Stmt. ¶¶66-68, 70.]

Finally, Mr. Scott testified that he was not treated similarly to Muslim employees. Muslim employees could lay out their prayer rugs, openly practice their fasting and/or not work Fridays consistent with their faith. [Stmt. ¶62.] Mr. Scott provided no evidence of any way in which he was discriminated against based on his religion, no evidence of any consequence to

11

him or his religious practices in the Dealership's accommodations of Muslim practices, and no evidence that he asked for similar accommodations and those accommodations were denied. Accordingly, Mr. Scott's religious discrimination claims must fail. Summary judgment must be entered in favor of the Dealership.

        **C.    The Undisputed Material Facts Show that Mr. Scott Cannot Prevail in his Retaliation Claim.**

Mr. Scott alleges that the Dealership retaliated against him for (1) participating in a co-worker's race discrimination investigation, and (2) for bringing his own EEOC charge of racial discrimination. [Stmt. ¶¶75, 79.] Mr. Scott's second claim can be easily dispatched. "[T]o establish a retaliation claim" a Plaintiff "must demonstrate that [he] engaged in protected activity, that [he] suffered an adverse action, and that there is a causal connection between the two." *Rowlands v. United Parcel Service*, 901 F.3d 792 (2018), citing *Rodrigo,* 879 F.3d at 243. Certainly, bringing an EEOC charge of racial discrimination is a protected activity. *Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 747 (7th Cir. 2010). However, Mr. Scott's last day at the Dealership was in January of 2019. [Stmt. ¶5.] He filed his EEOC charge on August 20, 2019. [Stmt. ¶79.] Mr. Scott alleges no adverse action *after* the filing of his EEOC charge. There can be no retaliation eight months *before* a protected activity. *McNutt v. Board of Trustees*, 141 F.3d 706, 709 (7th Cir. 1998) (To prevail in a Title VII violation case based on retaliation, plaintiffs must "establish that the alleged discrimination was the 'but for' cause of a disputed employment action.") Accordingly, the Dealership is entitled to summary judgment based on Mr. Scott's claim of retaliation for bringing his EEOC charge.

As to Mr. Scott's claim that he was retaliated against for participating in a co-worker's race discrimination claim, more discussion is required. Title VII prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted, or participated

in any manner in an investigation, proceeding, or hearing under this title." 42 USCS § 2000e-3. Mr. Scott alleges that he was retaliated against for refusing to sign a statement in favor of the Dealership in defense of a lawsuit brought by Reginald Knight. [Stmt. ¶75.] The record is devoid of any lawsuit, EEOC claim, or any other claim brought by Mr. Knight against the Dealership. [Stmt. ¶¶76, 77.]

Thus, Mr. Scott must be basing his claim on an internal investigation done by the Dealership after an altercation between Mr. Knight and another co-worker. [Stmt. ¶78.] But, the Seventh Circuit is clear. "A purely internal investigation does not involve a 'charge,' or testimony, and neither is it a 'proceeding' or a 'hearing'" as set forth under Title VII. *Hatmaker*, 619 F.3d at 747. In other words, "participation in an investigation under Title VII is not the same as participation in any disciplinary or employment-related investigation." *Sawyer v. Nicholson*, No. 06-CV-5907, 2010 U.S. Dist. LEXIS 115969, at *103 (N.D. Ill. Nov. 1, 2010).

This case is analogous to *Sawyer*. No. 06-CV-5907, 2010 U.S. Dist. LEXIS 115969, at *100-09. There, plaintiff, Gustafson alleged that her refusal to testify against a co-worker, Steele, her refusal to change her statement and submit a false statement, and her refusal to participate in retaliation against Steele constituted protected activity under Title VII. *Id.* at 101. Her testimony, however, was not in furtherance of an EEO investigation. *Id.* Rather, it was in an internal investigation relating to a patient abuse complaint. *Id.*

In response, Gustafson argued that the internal investigation was, itself retaliation for Steele supporting another co-worker's EEO claim. *Sawyer*. No. 06-CV-5907, 2010 U.S. Dist. LEXIS 115969, at 101. In rejecting Gustafson's plea to expand the definition of "investigation" under Title VII, the Court stated, "accepting Gustafson's version of the events, she was pressured to change a statement, but it was a statement that she made in an internal disciplinary proceeding,

13

not in an investigation, proceeding, or hearing related to Steele's EEO claims." *Id.* at 102. Put simply, "the participation clause is meant to protect employees who take part in or otherwise assist in an *EEOC* investigation; it is only those investigations that are conducted 'under' Title VII procedures." *Id., quoting Olsen v. Marshall & Ilsley Corp.*, 2000 U.S. Dist. LEXIS 22586, 2000 WL 34233699, at *18 (W.D. Wis. 2000) (emphasis in original) (citing *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998)). The internal investigation was not conducted under Title VII procedures. *Id.* at 105. Summary judgment was granted in favor of the employer on this retaliation claim. *Id.* at 106.

Similarly, here, the Dealership's investigation of the altercation between Mr. Knight and a co-worker was not conducted under Title VII. Mr. Scott's refusal to make a personal statement as to what he saw is not a protected activity under Title VII. Moreover, Mr. Scott has produced no evidence of any retaliation due to his refusal to participate in the Dealership's investigation. Summary judgment should be entered in favor of the Dealership and against Mr. Scott on his claims of retaliation.

**V. CONCLUSION**

Viewing the evidence as a whole, no reasonable fact finder could find in favor of Mr. Scott on his claims of unlawful discrimination, harassment or retaliation. Accordingly, summary judgment should be entered in favor of the Dealership.

Dated: April 23, 2021　　　　　　　　　　**CHEVROLET OF HOMEWOOD, INC.**

　　　　　　　　　　　　　　　　　　　　By: /Bethany N. Schols　　　　　　
　　　　　　　　　　　　　　　　　　　　　　Bethany N. Schols
　　　　　　　　　　　　　　　　　　　　　　Hardt, Stern & Kayne, P.C.
　　　　　　　　　　　　　　　　　　　　　　2610 Lake Cook Road, Suite 200
　　　　　　　　　　　　　　　　　　　　　　Riverwoods, IL 60015
　　　　　　　　　　　　　　　　　　　　　　Telephone: (847) 597-2150
　　　　　　　　　　　　　　　　　　　　　　bschols@hsklaw.com

14