# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RONNIE SCOTT,

Plaintiff,

v.

CHEVROLET OF HOMEWOOD,

Defendant.

Case No. 19-cv-08177

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronnie Scott brings this action against his former employer Chevrolet of Homewood for discrimination and retaliation on account of his race and religion in violation of 42 U.S.C. § 2000(e) *et seq.*, Title VII of the Civil Rights Act of 1964. Defendant Chevrolet of Homewood has moved for summary judgement on all claims. For the reasons stated below, Defendant's motion for summary judgment [64] is granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are

1

material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

## BACKGROUND[1]

---

[1] Scott failed to properly respond to Chevrolet's statement of material facts pursuant to Local Rule 56.1. He never cited to the record as required, and agreed to facts and then made legal arguments. Scott also failed to provide a "statement of additional facts" as allowed by Local Rule 56.1(b)(3) and instead freely cites his deposition in his response brief. "Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.,* 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019) (citation omitted). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.,* 919 F.3d 405, 414 (7th Cir. 2019) (internal citation and quotations omitted). While the Court will not enter judgment based on Scott's violations of the Rule, his failure to cite to admissible evidence will result in Chevrolet's facts being deemed admitted. His legal arguments contained in

Ronnie Scott (Scott) is an African American male who worked at Homewood Chevrolet (Chevrolet) in sales and leasing from July 2015 until January 26, 2019. Dkt. 79 ¶ 5.[2] He is a practicing Hebrew Israelite. Steve Phillipos is the owner and President of Homewood Chevrolet, and Robert Cuban is the General Manager. *Id.* at ¶ 3.

Scott alleges that during his employment he faced race discrimination when Chevrolet (1) reported him to the police, had him arrested and suspended him, (2) denied him commissions twice and delayed a commission payment once, (3) required him to execute a Named Driver Exclusion for insurance purposes, and (4) denied him access to a customer database, AutoAlert. Scott also asserts he faced racial harassment, discrimination based on his religion, and retaliation for refusing to support Chevrolet against a race discrimination claim. The undisputed facts surrounding these incidents follow.

## A. Race discrimination

### 1. *Scott's arrest and suspension*

On January 25, 2019, Chevrolet called the Homewood Police because Chevrolet believed that Scott processed a financial transaction with fraudulent proof of residence documents. Dkt. 79 ¶ 17. Scott was questioned by the police, handcuffed

---

response to the SOF will be disregarded and his failure to establish disputed facts will be addressed as warranted.

[2] When Scott responded to Chevrolet's statement of facts, he failed to "set forth the text of the asserted fact" as required by the LR 56.1(e)(1). Dkt. 72. Chevrolet therefore, provided the Court with a "Reply Statement" setting forth Chevrolet's original statements of fact, Scott's responses and Chevrolet's objections. Dkt. 79. The Court will refer to this document in the background section.

and placed under arrest in view of the showroom floor, in front of co-workers and customers.[3] *Id.* at ¶ 19. At that time, Scott was suspended. *Id.* at ¶ 20. It is not disputed that previously, on or about March 22, 2018, Chevrolet called the Homewood Police regarding a white employee accused of theft from the dealership. *Id.* at ¶ 13. That employee was also terminated after her arrest. *Id.* at ¶ 14. Also, on or about May 1, 2018, Chevrolet called the Homewood Police regarding a Greek employee accused of theft; that employee was also arrested and then fired. *Id.* at ¶¶ 15-16.

   *2. Commissions*

Scott testified that Chevrolet denied him three separate commissions due to his race. *Id.* at ¶ 12(b). Scott agrees that Chevrolet has a Pay Plan that details the compensation for all salespersons including commissions on a vehicle sale, the unit bonus plan, and the salesperson of the month bonus. *Id.* at ¶ 22. Commissions are only paid on completed deals after all paperwork is completed, money is received, and financing is approved. *Id.* at ¶ 23. If Chevrolet is required to repurchase a contract on a leased vehicle, the salesperson does not receive commission. The General Manager, Robert Cuban, met with each salesperson to discuss commissions to make sure calculations were accurate. *Id.*

In January of 2019, Scott claims he sold a Chevrolet Blazer. *Id.* at ¶ 26. Chevrolet states this transaction was for a Lease. *Id.* It is undisputed that on January 25, 2019, Mr. Cuban received a call from GM Financial requiring Chevrolet to repurchase the Lease because the agreement was processed with fraudulent proof of residence

---

[3] Scott filed a cause of action against Homewood Police based on this incident. Dkt. 66-21.

documents. *Id.* at ¶ 28.[4] Scott does not dispute that Chevrolet repurchased the Lease and returned the down payment to the customers. *Id.* at ¶ 31. Scott claims he was denied the commission because of his race. *Id.* at ¶ 12(b).

In another transaction Scott sold a vehicle to S.T. *Id. at* ¶ 32. Chevrolet claims the vehicle was a "secondary deal" meaning the customer had limited credit, so the lender required more documentation. Chevrolet states that Scott received commission on the deal after it was completed. *Id.* at ¶ 33. Scott agrees that the transaction was a "secondary deal" and does not dispute that he received his commission.[5] *Id.*

Finally, Scott claims that he sold a certified used Camaro to a customer, T.B., who later complained that the tires were bald. Chevrolet replaced the tires and "back-charged" Scott approximately $200 as opposed to the manager of used cars, Tim Marozas. Dkt. 71 at 6.[6]

### 3. Named Driver Exclusion

---

[4] This is the vehicle that led to Scott's arrest and there are facts in dispute regarding this transaction that the Court does not consider material. First, Scott claims he sold the vehicle as opposed to negotiating a Lease. But Scott agrees that GM Financial required that the Lease be rescinded because of fraudulent documentation. Dkt. 79 ¶ 30. Next, Chevrolet asserts in the statement of facts that the customers told the General Manager, Robert Cuban, that Scott created the fraudulent document. *Id.* According to Cuban's declaration, he did not talk to Scott or the customers but allowed the police to investigate. Dkt. 66-9, Cuban Decl. ¶ 22. The police spoke to Scott and the customers, and arrested Scott. Without citing any evidence, not his deposition or his affidavit, Scott denies creating fraudulent documents. Dkt. 79 ¶ 30 (Response). The Court disregards this denial as it is improper argument and does not contain a citation to the record.

[5] Scott asserts that Ed Schutz, the finance director, delayed his commission by manipulating the paperwork. While the length of the delay is not clear from the record, Scott's support for his assertion that Schutz deliberately delayed paperwork is hearsay, Dkt. 79 ¶ 33, and the Court disregards it.

[6] Scott cites his own testimony as support for these assertions. Dkt. 71 at 6, citing Dkt. 66-18, Scott Dep. 208:14-23.

Scott was required to sign a "named driver exclusion." He does not contest that Chevrolet's insurance policy provides: "Employees who drive Dealership or customer vehicles are covered by a standard liability insurance policy. The insurance coverage requires that employees maintain a good driving record." Dkt. 79 at ¶ 44. The underwriter reviews the motor vehicle records (MVRs) for Chevrolet's employees. Employees "with questionable or unacceptable" records are excluded from the policy and are required to sign an "Acceptance of Named Driver Exclusion." *Id.* at ¶¶ 44–6.

On October 2, 2018, the insurance company informed Chevrolet its policy would not be renewed until four (4) employees, including Scott, signed exclusions. *Id.* at ¶ 47. It is undisputed that the employees required to sign the exclusion included both Black and white employees.[7] *Id.* Scott testified he was forced to sign the form because of his race. *Id.* at ¶ 12(f).

*4. AutoAlert*

Chevrolet has access to AutoAlert, a "paid data-mining service, containing information about service customers and customers who previously purchased or leased vehicles from the Dealership. It could be used as an additional source of leads by salespersons." Dkt. 79 ¶ 37. Only salespersons with a track record of making sales calls received access to leads through AutoAlert, regardless of how many cars they

---

[7] Scott disputes that his driving record should prohibit him from receiving coverage. Dkt. 79 ¶ 47-8. He relies on hearsay—his conversation with his personal insurance agent—to assert that there was no basis to deny him coverage. *Id.* Chevrolet responds that Scott admitted at deposition that his license was previously suspended. Dkt. 79 ¶ 47, (Reply [Plaintiff's response to ¶ 47] ignores his prior "testimony that he had a suspension on his driving record from the State of Illinois [Scott Dep. 188:9-11]."

sold. *Id.* at ¶ 38.[8] Chevrolet provided and denied access to Black and white employees —depending on whether they made the necessary volume of solicitation telephone calls. Dkt. 79 ¶ 39-40. Scott asserts he was denied access because of his race.

### 5. *Racial harassment*

Scott testified that co-workers used the n-word at Chevrolet. Dkt. 79 ¶¶ 55-8. It is undisputed that in one instance Scott told a co-worker to stop using the n-word and the co-worker did stop. *Id.* Scott complained to Robert Cuban about another co-worker using the n-word on two occasions and no one was reprimanded. *Id.*

Scott testified about a physical altercation that arose when an employee, Billy Khatib, called Reginald Knight the n-word. Scott notified Mr. Phillipos about the racial slur. *Id.* at ¶ 60. This was the only time Scott complained to Mr. Phillipos. It is undisputed Billy Khatib was terminated. *Id.* at ¶ 59. Scott contends that Billy Khatib was terminated because he was in a physical altercation with another employee on the showroom floor, not because he used the n-word. *Id.* at ¶ 59.

It is not disputed that Chevrolet had a policy for handling employee complaints. *Id.* at ¶ 8. If a supervisor is involved or an employee is uncomfortable reporting to a supervisor, a complaint could be made to the Comptroller, Gina Morin or to the President, Steve Phillipos. *Id.* This policy was also outlined in an employee handbook that everyone received, including Scott. *Id.* at ¶ 7. Scott also attended a mandatory meeting regarding harassment at Chevrolet on June 5, 2018. *Id.* at ¶ 11. Scott never

---

[8] This fact is deemed admitted. Scott admits it but then contends, without evidentiary support, he made more than enough phone calls to qualify. Dkt. 79 ¶ 38.

notified the Comptroller about harassment, including the use of the n-word at Chevrolet. Dkt. 66 ¶ 61.

Although not properly submitted in response to Chevrolet's uncontested facts, Scott testified that racial slurs were used at the dealership "plenty of times." Dkt. 71 at 15; Dkt. 66-18 ("Scott Dep.") 269:1-3. He recalled a situation in 2017 or 2018 where Ed Schutz, Finance Manager, was in his office and a cashier named Trisha was present and Schutz used the n-word in referring to Scott: calling him "F'g – F'g N word." Scott Dep. 270-75. Although he does not offer specifics, Scott testified that his complaints oftentimes went ignored or faced hostile supervisors. Scott Dep. 278:22-24.

### B. Religious Discrimination

Scott wore an amethyst necklace as part of his religious practice. Dkt. 79 ¶ 63. Scott testified that Chevrolet attached a "letter" to all employees' paychecks prohibiting the wearing of religious jewelry. *Id.* at ¶ 64. He says that the letter stated that "gaudy religious jewelry" was banned in the workplace. *Id.* at ¶ 67.

Chevrolet denies having a policy regarding, limiting, or prohibiting the wearing of religious jewelry. *Id.* at ¶ 70. The parties agree that Ms. Morin was responsible for providing dress code updates by attaching notices to employees' paychecks, *Id.* at ¶65, and she swears she never directed any such notice to be disseminated. *Id.* at ¶¶ 66–7. Furthermore, three fellow employees testified that they did not receive a notice from Chevrolet prohibiting the wearing of religious jewelry.

8

*Id.* at ¶ 68. Finally, no document indicating the prohibition of religious jewelry was produced during discovery. *Id.* at ¶ 69.

Scott testified that Schutz said, "I didn't know they let faggots in Hebrew, be Hebrew" and said that Scott wasn't "a Hebrew." *Id.* at ¶ 71. When he complained to his supervisors, no action was taken. *Id.* at ¶ 72. Scott agrees he did not complain to Ms. Morin or Mr. Phillipos about religious discrimination. *Id.* at ¶ 73-4.

### C. Retaliation

Scott's retaliation claim involves a race discrimination claim by a co-worker, Reginald Knight. Scott states he refused to sign a statement in favor of Chevrolet in defense of a lawsuit brought by Reginald Knight. Dkt. 79 ¶ 75. The parties agree that Chevrolet never received any EEOC charges, complaints, lawsuits, or any claims by Reginald Knight. *Id.* at ¶ 76. No complaint, EEOC charge or other evidence of a lawsuit by Reginald Knight has been produced. *Id.* at ¶ 77. Scott did refuse to write a personal statement regarding the altercation between Reginald Knight and a coworker during Chevrolet's internal investigation of that altercation stating, "No, I done told you before. I'm not –I'm not signing nothing. I'm not giving a statement. I'm not doing it." *Id.* at ¶ 78.

### ANALYSIS

On August 20, 2019, Scott filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). He received a right to sue letter on November 21, 2019. Dkt. 1 at 11. He filed this lawsuit on December 13, 2019. Dkt. 1.

In his complaint, Scott brings claims against Chevrolet Homewood for race discrimination in violation of Title VII of the Civil Rights Act of 1964, retaliation for exercising his rights under Title VII, and for religious discrimination under Title VII. Chevrolet moved for summary judgement on all claims.

## I. Race Discrimination

Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Scott alleges race discrimination claims as well as a hostile working environment claim under Title VII.

The parties have both proceeded under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 (1973). This approach requires the plaintiff to make a *prima facie* case of discrimination, and if he does so, the burden shifts to the employer to offer a nondiscriminatory reason for the adverse employment action. If the employer does so, the burden then shifts back to the plaintiff to show that the employer's stated reason as a pretext.

To establish a prima facie case Scott must show that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). The parties agree that Scott is a member of a protected class, and Chevrolet does not challenge whether

Scott has experienced adverse employment actions. Chevrolet asserts Scott has failed to provide evidence that he was treated less favorably than a similarly-situated employee outside of his protected class. Dkt. 65 at 2. Scott asserts that he has established that the adverse actions he suffered were not levied against similarly situated non-Black employees. Dkt. 71 at 5. "Although they need not be identically positioned, 'similarly situated employees must be directly comparable to the plaintiff in all material respects.'" *Igasaki,* 988 F.3d at 948 (quoting *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009). Further "[t]he burden for showing he was not treated similarly is on the plaintiff." *Id.*

Scott relies on the following several adverse actions: (1) reporting him to the Homewood police and then suspending him; (2) less favorable treatment in commission payments; (3) requiring him to sign a Named Driver Exclusion; and (4) denying him access to AutoAlert.[9] As discussed below, Scott has failed to present sufficient evidence concerning a similarly situated employee to establish a prima facie case as to each of these allegations. By failing to do so, Scott fails the *McDonnell Douglas* standard.

In *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit held that when considering summary judgment motions for discrimination claims "courts must consider the evidence as a whole" to determine whether "a

---

[9] Scott's complaint also alleged he was denied bonus payments for social media posts and required to work "days off" in a discriminatory manner. Dkt. 1 ¶¶ 20-21. Scott failed to respond to Chevrolet's summary judgment arguments regarding these claims. Dkt. 71. Any claim based on these assertions is therefore waived. *Shipley v. Chicago Bd. of Election Commissioners,* 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived.").

plaintiff presents evidence that permits a reasonable factfinder to conclude that the employer took an adverse action against the employee because of the employee's race or national origin." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). This Court finds that Scott's claims similarly fail under this standard. Considering the evidence as a whole, Scott has presented no evidence that his race caused the actions alleged, including his suspension and termination.

As to Scott's claim that Chevrolet called the police and, after his arrest, suspended and terminated him, Chevrolet did call the police after it learned that fraudulent information was submitted in a leasing agreement negotiated by Scott. The question is whether Chevrolet treated Scott in the same manner as other employees. Chevrolet presents undisputed evidence that it called the police on two former employees, both based on its belief that the employee participated in fraudulent activity or stole from the dealership. Dkt. 79 ¶¶ 13-16. One of those employees was white, the other was Greek. Scott argues that the manner in which Chevrolet and the police department conducted their investigation was more severe and only occurred that way because he is Black. Dkt. 71 at 9. Scott was questioned in a glass office in view of the entire dealership, he was handcuffed and escorted out of the dealership in front of customers. *Id.* Scott argues, but presents no evidence, that his treatment was more severe than the other employees who were arrested. Assuming it was more severe, this treatment was at the hands of the Homewood Police, not Chevrolet. In fact, Scott has brought litigation against Homewood Police for this treatment. Scott does not argue that the Homewood Police Department was

12

acting under the direction of Chevrolet. Rather, it is undisputed that Chevrolet suspended and terminated a white and a Greek employee following arrest for alleged on the job criminal activity. Scott has failed to present a *prima facie* case in this regard.

Scott alleges discrimination based on unfair commissions on three different occasions. Dkt. 71 at 5. It is undisputed that Scott was subject to the dealership Pay Plan which outlined when salespeople earn commission. Scott relies on the instance that resulted in his arrest. But Scott does not dispute that he did not earn commission on that truck because Chevrolet was required to buyback the Lease. In another instance, Scott alleges that one of his commissions was delayed involving customer, T.S. While Scott provides no evidence outside of his deposition that the commission was delayed, it is uncontested that he received the commission. Moreover, Scott presents no evidence that other employees were treated better.

Similarly, Scott testified that he sold a used car and when the customer complained about the tires and his commission was therefore charged back to him. Scott has not presented any evidence that Chevrolet treated other non-Black employees differently when it came to commissions. Rather, Chevrolet presents undisputed evidence that it has a Pay Plan in place governing commissions. Scott does not dispute this fact. Therefore, Scott fails to establish a *prima facie* case regarding discriminatory commissions.

Scott next asserts he was denied access to AutoAlert, a program that would have allowed him to increase his sales by having access to a large database. Dkt. 71

at 5. He asserts that Chevrolet's decision to "ignore [his] sales abilities and unique expertise in selling Corvettes and Camaros in order to extend AutoAlert access to … a white salesman with far less experience, reasonably creates an inference of racial discrimination." Dkt. 71 at 7-8. Scott alleges that Mike Albright,[10] a white salesman with less seniority, had access to the program. *Id.* at 7.

Chevrolet argues that Albright and Scott are not similarly situated because, unlike Scott, Albright made the necessary number of calls to qualify for access to AutoAlert. Rather than sales, Chevrolet determines access to AutoAlert by the number of calls made by each salesperson. Further, Chevrolet points to three Black employees who had access to AutoAlert based on their calling records. Chevrolet also points to two white employees and a Moroccan employee that were denied access because they failed to make the required number of calls. In response, Scott argues, without evidence, that access is not based on the number of calls made. However, Scott does not dispute the fact that "[o]nly salespersons with a proven track record of *making sales calls* received access to leads through AutoAlert, regardless of how many cars they sold." Dkt. 79 ¶ 38 (emphasis added).

In the end, Scott has failed to provide any evidence that Albright and he were similarly situated, i.e., that Albright did not qualify based on the number of calls he made or that he (Scott) did. On the other hand, Chevrolet has produced evidence that other white employees were denied access to AutoAlert and Black employees who

---

[10] Multiple employees, both Black and white, have access to AutoAlert. Dkt. 79 ¶ 39. Chevrolet names the employees by initials and identifies Albright as "M.A. (white)." *Id.*

made calls were provided access. Scott has failed to present a *prima facie* case of discrimination in this regard.

Finally Scott alleges he was discriminated against when he was forced to sign a Named Driver Exclusion by his employer. Dkt. 71 at 8. Chevrolet's underwriter determines who qualifies to be covered by the insurance. "Employees with 'questionable or unacceptable MVRs' as determined by the underwriter, are excluded from the policy requiring an 'Acceptance of Named Driver Exclusion" to be executed by both the employee and the Dealership." Dkt. 65 at 9 *quoting* Dkt. 79 ¶ 46. Scott agrees that this is the policy. First, Scott responds, relying only on hearsay, that he talked with his personal insurance agent and local DMV to confirm that he has a clean driving record. However, Scott admitted during his deposition that his license had been suspended by the state of Illinois. Further, it is undisputed that white salespeople were also required to sign the exclusion because of their driving record. Scott has again failed to establish a *prima facie* case.[11] In sum, Scott has failed to establish a *prima facie* case that any of the adverse employment actions he alleges were the result of race discrimination under Title VII.

## II. Hostile Work Environment

---

[11] Chevrolet argues it cannot be liable because it was not the decision-maker in identifying who was excluded from the policy. Chevrolet relies on an email from the insurance company refusing to execute the policy until several employees signed exclusion forms. Dkt. 66-15. Scott does not respond to this argument and so waives any response. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered…We apply waiver even if the issue may have been before the district court in more general terms, still holding a party to its responsibility to make a specific argument.") (cleaned up). The Court need not reach the issue since Scott has failed to present even a *prima facie* case.

Scott claims that he faced race harassment by fellow employees at Chevrolet in the form of racial slurs used by co-workers. Additionally, Scott claims that after making complaints to management about the use of racial slurs, they did not take any action. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "This is a demanding standard; a plaintiff's evidence must go well beyond showing rudeness or incivility…, even if it need not reach the point of 'hellishness.'" *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 973 F.3d 718, 728 (7th Cir. 2020) (citations omitted).

To prove that an employment environment was actionably hostile, a plaintiff must show that "(1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (citations omitted). Relevant to this inquiry are "the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work performance." *Id.*; *see also Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013) (reversing summary judgement on supervisor harassment claim after considering: (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would

16

deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim).

Scott testified that he frequently heard the finance director, Ed Schutz, and used car director, Tim Marozas use the n-word. Dkt. 71 at 11. He heard Schutz use the n-word on multiple occasions, including during an interaction between Schutz and a cashier, during an interaction between Gary Dunn, Schutz and Scott's customer, and while Scott was working with a customer who was a priest. Scott Dep. 269-271. One time, when he was leaving Schutz' office, Schutz said the n-word. *Id.* at 275. Scott also testified that Marozas called him the n-word on one occasion. Scott Dep. 271:20-24.[12]

Scott's testimony is bolstered by testimony from two co-workers, Lemanda Lee and Derrick Smith. Smith testified that Mr. Morino called him (Smith) the n-word once and he heard Morino use the word three other times. Dkt. 66-19 ("Smith Dep.") 37:11-21, 38:1-4. One of those times, Morino called Scott the n-word. *Id.* at 38:7-24. Smith also testified that he heard Mr. Perrone use the n-word "maybe two or three times and Mr. Schutz, once." *Id.* at 40-41. Lemanda Lee also testified that she heard an employee using the n-word toward a Black employee. Dkt. 66-17 ("Lee Dep.") at 38:12-20.

---

[12] Chevrolet complains that Scott failed to detail the use of derogatory language in his complaint. That is not required. *Gates v. Bd. of Educ. of the City of Chicago,* 916 F. 3d 631, 635 (7th Cir. 2019) (noting that when specifics of derogatory language is not raised until a plaintiff's deposition, it can still be substantively considered at summary judgement). Further, Scott's EEOC Charge stated a harassment claim. Dkt. 66-22

Chevrolet responds that Scott only testified to four instances where the n-word was used in the workplace, making the conduct insufficient to rise to the legal standard of a hostile work environment under Title VII. Dkt. 65 at 11. This is in dispute since Scott testified that he had heard the word used "plenty of times" at the dealership, although he could not put a number on it. Scott Dep. 269:1-16. These slurs were at times directed toward him. *Id.*

The Seventh Circuit found that there is no "magic number of slurs" that indicates a hostile work environment, but an "unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950 (7th Cir. 2005). In *Gates v. Bd. of Educ. of the City of Chicago,* 916 F.3d 631, 638–39 (7th Cir. 2019), the court observed that: "Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Id.* quoting *Rodgers v. Western-Southern Life Insurance Co.,* 12 F.3d 668, 675 (7th Cir. 1993).

While the Court recognizes *Gates* involved treatment by a supervisor, Scott has provided sufficient evidence for a reasonable jury to conclude that he was subjected to racially harassing conduct that was severe or pervasive. Separate incidents that are not individually severe may trigger liability because they frequently occur. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (holding that when conduct such as an inappropriate comment and touching is not severe on its own, but is an "incessant part of the workplace," the "severe or pervasive requirement can be

met."). In *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013) the Seventh Circuit reversed summary judgment on a harassment claim where the plaintiff showed that a top manager "on at least five occasions over a four-year period, referred to yard laborers as 'donkeys' in Lambert's presence and on one occasion called an African–American co-worker a 'gorilla,' and another supervisor told Lambert that he did not respect him because he is a "n——r" while yelling and screaming at him." The Court described this as "right on the line of conduct that was offensive." *Id.*

This Court finds a reasonable jury could conclude that the racist language testified to, by three different employees, some of it directed at Scott, created a hostile work environment. A reasonable trier of fact could conclude that these slurs were frequent, offensive and unreasonably interfered with Scott's work.[13]

The court must next consider whether Scott complained about the harassment. In order for an employer to be held liable for a hostile work environment under Title VII, a plaintiff must show the employer has been "negligent in either discovering or remedying the harassment." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004). This is a dispositive fact in hostile work environment claims. *Id.* Once an employer is aware of the harassment, liability can be avoided if it takes "prompt and

---

[13] Chevrolet's reliance on *Outley v. City of Chicago,* 354 F.Supp.3d 847, 866-867 (N.D. Ill. 2019), is unpersuasive. *Outley* supports the well-established principle that "stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." Dkt. 65 at 9. The instant case concerns a harassment claim, as opposed to a failure to promote, and is not confined to a stray remark. Here, the focus is whether Scott presents evidence of a hostile environment, not whether the work environment supports a finding of pretext.

appropriate corrective action reasonably likely to prevent the harassment from recurring." *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 978 (7th Cir. 2004).

Chevrolet claims that Scott only complained to management once and the dealership fired the problem employee in response. But Scott testified that he complained to Mr. Cuban twice and complained to Mr. Phillipos once.

Scott complained to Mr. Phillipos when Billy Khatib used racial slurs toward a Black salesman. That incident also involved a physical altercation between the two salesmen in the middle of the dealership. Khatib was fired after this incident. Chevrolet asserts, through the affidavit of Mr. Phillipos, that Khatib was fired because of his language after an internal investigation. Dkt. 65 at 12; Dkt. 66-2 ("Phillipos Dec.") ¶¶ 25-27. Scott speculates, without admissible evidence, that Khatib was only fired because of the physical altercation, not the use of the "n-word." Chevrolet's position is unrebutted with admissible evidence. If this was the only time Scott complained, Chevrolet's request for summary judgment would be well-taken.

But Scott testified that he complained to Robert Cuban on two separate occasions and no action was taken. Dkt. 71 at 14; Scott Dep. 286:17; 293:6-10. He also testified that he complained "plenty of times," Scott Dep. 342:19-25, and that management witnessed people using the n-word and did not take any action, even when employees were directly using the n-word toward Scott. Scott Dep. 270:19-24. Another employee, Derrick Smith, corroborates this claim in his deposition when he says that Scott complained to Mr. Cuban after an incident involving Mr. Morino using racial slurs toward Scott. Smith Dep. 38:21-24.

This testimony serves as evidence from which a reasonable jury could conclude the Scott "made a concerted effort to inform [Chevrolet] of the racial harassment [he] was alleging experiencing." *Golden v. World Sec. Agency, Inc.*, 884 F. Supp. 2d 675 (N.D. Ill. 2012) (employee's testimony that she complained to "the type of employee[s] who could be expected to convey her complaints to someone who could stop harassment" was sufficient to survive summary judgement) citing *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382 (7th Cir. 2010).

Accepting the evidence in the light most favorable to Scott, there is a material issue of disputed fact as to whether Chevrolet knew of the race harassment and responded appropriately.

Lastly, Chevrolet asserts that Scott's claim fails because the employee handbook requires complaints to be made to Chevrolet's Comptroller, which Scott did not do. This is not a successful argument. In *Cerros,* 398 F.3d at 944, the court held that the relevant inquiry is whether the employee adequately alerted his employer to the harassment, thereby satisfying his obligation to avoid the harm, not whether he followed the letter of the reporting procedures set out in the employer's harassment policy. Notifying the employer in some way satisfies the employees obligation to avoid the harm. *Id.* at 952 ("At bottom, the employer's knowledge of the misconduct is what is critical, not how the employer came to have that knowledge.").

For these reasons, Scott's hostile work environment claim under racial discrimination survives summary judgement.

### III. Retaliation under Title VII

Scott's complaint includes a claim for retaliation under Title VII. Dkt. 1 at ¶ 31, 35 ("after [he] refused to sign the statement in support of the dealership, [he] began to experience increased hostility from dealership management and major payroll problems resulting in a withholding of [his] compensation.")

A *prima facie* case of retaliation under Title VII requires a plaintiff to show: "(1) he engaged in a statutorily protected activity, (2) [his] employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield,* 926 F.3d 894, 896 (7th Cir. 2019). Chevrolet argues that there was (1) no adverse action taken after Scott's own EEOC claim and (2) internal investigations are not considered a protected activity under Title VII. Dkt. 65 at 14-15. Scott does not respond to these arguments and therefore summary judgment is appropriate.[14] *Gates*, 916 F.3d at 641 (on summary judgment, "[t]he district court was not required to address a claim or theory that plaintiff did not assert.")

Contrary to what is contained in his complaint, Scott asserts that there is "a genuine issue of fact exists as to whether Defendant retaliated against Plaintiff for his many complaints to [Chevrolet] management about the harassment he experienced from his coworkers." Dkt. 71 at 17. Scott fails to establish or even describe any adverse action taken in retaliation, instead, he claims that he "never

---

[14] Scott cannot claim retaliation based on his EEOC complaint because he was no longer employed at the dealership when he filed it. Scott cannot claim retaliation based on his refusal to participate in the internal investigation about Mr. Knight because participation in an internal investigation is not a "protected activity" under Title VII. *See Hatmaker v. Memorial Medical Center,* 619 F.3d 741, 747 (7th Cir. 2010) ("[t]o bring an internal investigation within the scope of the clause we would have to rewrite the statute.")

experienced any improvement in his working conditions." *Id.* at 18. In a Title VII retaliation claim, Scott must show that discrimination was the "but for" cause of the employment action. *McNutt v. Board of Trustees*, 141 F.3d 706, 709 (7th Cir. 1998). Assuming for the sake of argument that Scott complained and that those complaints constituted protected activity under Title VII, Scott has presented no evidence from which a reasonable jury could conclude that Chevrolet took a material adverse action against him for his complaints. Therefore, no reasonable trier of fact could conclude that Scott has a viable retaliation claim. Summary judgement is granted on this claim.

### IV. Religious Discrimination Claim

Chevrolet argues that the "undisputed material facts show that Mr. Scott was not discriminated against because of his religion." Dkt. 65 at 12. In his complaint, Scott asserts that the dealership prohibited him from wearing religious jewelry through a notice that was sent out to all employees. Scott presents no evidence to support this. In fact, testimony of other employees cuts against his claim. Lee Dep. 36:9-12; Smith Dep. 36:14-24, 37:1-9; Dkt. 66-20 ("Weldy Dep.") 54:23-24, 55:1-3. Scott does not submit the alleged letter as evidence of discrimination. Further, Ms. Morin, the person responsible for disseminating such notices, denies ever doing so. Dkt. Mr. Phillipos, the person responsible for setting the dress code denies having such a policy.

Scott's complaint also alleges that he faced religious discrimination when he was not treated similarly to Muslim employees and his religious practices were not

23

accommodated. Dkt. 1 at ¶ 13. Chevrolet argues Scott never requested accommodations for his religion. Scott did not respond to this argument, and it is waived.

Scott argues that he faced religious discrimination when employees mocked him for his religion, used slurs regarding his sexuality and his religion that made him feel ashamed based on his religious association.[15] Dkt. 71 at 12.

Construing Scott's pleadings as a hostile work environment claim based on religion, Scott must show (1) [he] was subject to unwelcome harassment; (2) the harassment was based on [his] national origin or religion (or another reason forbidden by Title VII); (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826, 834 (7th Cir. 2015) citing *Cooper–Schut v. Visteon Auto. Sys.,* 361 F.3d 421, 426 (7th Cir. 2004). Scott relies on *Huri* in his briefing to argue that he was "arbitrarily targeted for mockery and harassment due to his religious affiliation." Dkt. 71 at 12. While *Huri* finds that targeted harassment due to religious affiliation is sufficient to fulfill the first three elements of the claim, missing from Scott's analysis is any evidence that he alerted his employer of the conduct. Rather, he claims that the employer tolerated this behavior, but cites to no

---

[15] Scott's response states that "Plaintiff brought suit against Defendant for discrimination based on race, religion, and sexual orientation, as well as retaliation, in violation of Title VII …." Dkt. 71 at 1. While Scott's EEOC charge did make a claim for "discrimination based on sex," he made no gender or sexual orientation claims in his complaint. This statement in summary judgement is not sufficient to assert a claim of discrimination, harassment or retaliation based on gender or sexual orientation. Any such claims are waived.

evidence that they were aware. Dkt. 71 at 12–13. This is not sufficient to survive summary judgement. Additionally, because this element is dispositive, we do not analyze whether the harassment meets the other elements of a hostile work environment claim based on religion. Scott's claim for religious discrimination fails.

## V. CONCLUSION

For the stated reasons, Defendant's motion for summary judgment is granted in part and denied in part. Plaintiff's claim for hostile work environment in Count I survives. Summary judgment in favor of defendant is granted on the remaining allegations.

E N T E R:

Dated: February 22, 2022

_____
MARY M. ROWLAND
United States District Judge

25